United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MANUELA HERNANDEZ, et al., <br> Plaintiffs, <br> v. <br> COUNTY OF SANTA CLARA, et al., <br> Defendants. | Case No. 5:19-cv-07888-EJD <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> Re: Dkt. No. 38 |

Plaintiff Manuela Hernandez filed this civil rights action on behalf of herself and as guardian ad litem for the children of her son, Carlos Aguilar, who on December 2, 2018 committed suicide while an inmate at the Santa Clara County Jail. Now pending before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint for failure to state a claim. Having considered the parties' briefs, the relevant law, and the record in this case, the Court GRANTS the Motion to Dismiss.

## I.    BACKGROUND

### A.    Factual Background

The following facts derive from Plaintiff's allegations in the operative Second Amended Complaint ("SAC"), Dkt. No. 35, which generally must be treated as true at the pleading stage. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).

The decedent, Carlos Aguilar ("Aguilar"), was admitted to the Elmwood Correctional Facility of the Santa Clara County Jail on July 25, 2018. First Amended Complaint ("FAC"), Dkt.

No. 19 at 5.[1]  Plaintiff asserts that in the days leading up to his suicide, Aguilar's "behavior and classification status forewarned mental health issues as well as a possible suicide attempt."  SAC ¶ 25.  On November 27, 2018, Aguilar notified Deputies Munoz (first name unknown) and Michael Fortino that he wanted to go into protective custody in order to dissociate from the "South Siders Sureños" gang and believed that someone was spreading rumors about him.  *Id.*

Deputies Jon Quiro and Hidalgo (first name unknown) participated in ultimately reclassifying Aguilar, while Sergeant Allen (first name unknown) and Captain Christopher Grumbos were notified.  *Id.*  Aguilar was transferred to protective custody on November 29, 2018 where Deputy Lamar (first name unknown) observed that Aguilar appeared paranoid and exhibited agitated behavior.  *Id.* ¶ 26.  Plaintiff's SAC further quotes Deputy Lamar's Administrative Rehousing Report and she alleges that Deputy Lamar forewarned Aguilar's mental health issues:

> "The first day that he [Aguilar] came into that unit on 11/29/18 he appeared to be paranoid and thinking that other inmates wanted to get him because he was a dropped out South Sider. I pulled him out a[nd] spoke to him about the unit. I explained that they are all drop outs and just wanted to do [their] time without problems. He then asked if he could sit in the holding cell and collect his thoughts. The next day he continued to look paranoid standing off to the side and not talking to other inmates. I asked him what was wrong, and he said the he was tired and wanted to go to sleep. I told him to go to sleep on his bunk and he said that he couldn't."

SAC ¶ 26.  Plaintiff next alleges that on December 1, 2018, inmate trustee Alex Valdivia reported to Deputy Munoz that Aguilar exhibited "strange behavior."  *Id.* ¶ 27.  The SAC details how Aguilar threatened other inmates and was acting "paranoid" on this day.  *Id.*  Aguilar was then moved to the M4-C unit within the facility for a higher protective custody classification and to "further monitor his behavior."  *Id.*  On December 2, 2018, Deputies Alan Tse and Tambini (his first name is unknown) were assigned to supervise the M4-C unit.  *Id.* ¶ 24.  At 6:30 p.m., Deputy Tse completed a classification count, where he "made eye contact" with Aguilar.  Then, at 7:15

---

[1] Because the paragraphs in the FAC are misnumbered, the Court will identify pincites by page number.

1  p.m., Deputies Tse and Tambini opened cell doors for programming but Aguilar did not exit.

2  Finally, at 7:59 p.m., Deputy Tambini performed another welfare check on Aguilar and found him

3  hanging from the top bunk in his cell. *Id*. Aguilar, it was determined, died by suicide. *Id*. ¶ 28.

4    **B.    Procedural History**

5    On December 2, 2019, Plaintiff filed the instant action on behalf of herself and as guardian

6  ad litem for Aguilar's two minor children. Dkt. No. 1. The parties stipulated to Plaintiff filing an

7  amended complaint, which she did on February 12, 2020. Dkt. Nos. 16, 19. Plaintiff's FAC

8  claimed that County defendants were deliberately indifferent to Aguilar's suicidal ideations at the

9  time of his booking at the Elmwood facility. Plaintiff brought a total of eight Counts: (1) a claim

10  under 42 U.S.C. § 1983 for violation of the decedent's Fourteenth Amendment rights; (2) a claim

11  under 42 U.S.C. § 1983 for violation of the decedent's and the Plaintiff's Fourteenth Amendment

12  rights, styled as a "wrongful death" claim; (3) a claim under 42 U.S.C. § 1983 for violation of the

13  decedent's Fourteenth Amendment rights, styled as a "survival action"; (4) a claim under 42

14  U.S.C. § 1983 for violation of Plaintiff's right to familial relationship; (5) a claim for negligence,

15  brought under California Government Code §§ 815.2, 820; (6) a claim for failure to summon

16  medical care in violation of California Government Code § 845.6; (7) a claim for negligence,

17  styled as a "wrongful death" action under California Code of Civil Procedure §§ 377.60, 377.61;

18  and (8) a common law claim for intentional infliction of emotional distress. Counts 1, 2, and 5

19  were brought against the County of Santa Clara ("County"); Laurie Smith, Sheriff for the County

20  of Santa Clara ("Sherriff Smith"); Sheriff Deputy Tambini (first name unknown); Sheriff Deputy

21  Alan Tse; and 50 Doe employees of the County of Santa Clara Sheriff's Department. *See* FAC at

22  3-4. Counts 3, 4, 6, 7, and 8 were brought against all defendants other than Sheriff Laurie Smith.

23    On March 3, 2020, the County, Sheriff Smith, Deputy Tambini, and Deputy Tse filed a

24  motion to dismiss. *See* Dkt. No. 21. On June 11, 2020, the Court granted the motion to dismiss

25  without prejudice as to Counts 1-7 and with prejudice as to Count 8. *See generally* Order

26  Granting Motion to Dismiss ("Ord."), Dkt. No. 30. On July 24, 2020 Plaintiff filed her SAC. *See*

27

28

United States District Court
Northern District of California

1    Dkt. No. 35.  The SAC asserts the same eight claims asserted in the FAC, but now appears to

2    allege that the County and County employees were deliberately indifferent to Aguilar's behavior

3    following his request to be placed in protective custody in the days leading up to his suicide.  As it

4    currently stands, Plaintiff brings the first three federal claims under 42 U.S.C. § 1983 against

5    Sheriff Deputy Tambini (first name unknown); Sheriff Deputy Alan Tse; Sheriff Deputy Michael

6    Fortino; Sheriff Deputy Jon Quiro; Sheriff Deputy Hidalgo (first name unknown); Sheriff Deputy

7    Lamar (first name unknown); Sergeant Allen (first name unknown); Captain Christopher

8    Grumbos; and 50 Doe employees of the County of Santa Clara Sherriff's Department (Count 1-3).

9    *See* SAC at 9-12.[2]  The fourth claim was brought against these same defendants as well as the

10   County (Count 4).  *Id*. at 12.  Finally, Plaintiff brings the four state law claims against the same

11   defendants, with the seventh claim for wrongful death also being brought against the County.  *See*

12   *id.* at 13-16.

13       On August 24, 2020, all individually named defendants along with the County

14   (collectively "Defendants") filed their Motion to Dismiss Plaintiff's SAC.  Dkt. No. 38 ("Mot.").

15   On September 6, 2020, Plaintiff opposed the Motion to Dismiss, and attached a proposed third

16   amended complaint, which appears to be an attempt to cure her SAC of some of the deficiencies

17   highlighted in the Motion to Dismiss.  Dkt. No. 40 ("Opp.").  On September 14, 2020, Defendants

18   filed their reply.  Dkt. No. 42 ("Reply").

19   **II.    MOTION TO DISMISS STANDARD**

20       Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

21   statement of the claim showing that the pleader is entitled to relief."  A complaint that fails to meet

22   this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Put another

23   way, "[a] motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

24   claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation*

25

26   _____

27   [2] Because the paragraphs in this section of the SAC are misnumbered, the Court will identify
     pincites by page number.

1   *Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d

2   729, 732 (9th Cir. 2001)).

3          To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim

4   to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

5   claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

6   the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

7   556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but

8   it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal

9   quotation marks omitted).

10          In evaluating the sufficiency of a complaint, the court must "accept factual allegations in

11   the complaint as true and construe the pleadings in the light most favorable to the nonmoving

12   party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  At the

13   same time, a court need not accept as true "allegations that contradict matters properly subject to

14   judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or

15   unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

16   (internal quotation marks and citations omitted).

## III.    REQUEST FOR JUDICIAL NOTICE

18          As a preliminary matter, Defendants request that the Court take judicial notice of two

19   exhibits.  *See* Mot. at 4-5, Exhibit A, Dkt. No. 38-1; RJN, Dkt. No. 39-1.  Defendants first ask that

20   the Court take judicial notice of Deputy Lamar's complete Administrative Rehousing Report,

21   which Plaintiff referenced in the SAC.  *See* Mot., Exhibit A, Dkt. No. 38-1, Sherriff Deputy

22   Lamar's Administrative Rehousing Report (dated 12/01/2018) (hereinafter "Rehousing Report").

23   Next, Defendants ask that the Court take judicial notice of court minutes from Aguilar's California

24   state case.  *See* RJN, Exhibit B, Dkt. No. 39-1, (hereinafter "State Court Minutes").

25          Generally, the Court may not consider any material outside the pleadings in ruling on a

26   Rule 12(b)(6) motion.  *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011).

27

28   Case No.: 5:19-cv-07888-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
COMPLAINT

1   There are two exceptions to this rule, when the complaint necessarily relies on the documents or

2   where the court takes judicial notice of documents.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689

3   (9th Cir. 2001) (citation omitted).  The incorporation by reference doctrine allows material that is

4   attached to the complaint to be considered, as well as "unattached evidence on which the

5   complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is

6   central to plaintiff's claim; and (3) no party questions the authenticity of the document."

7   *Corinthian Colleges*, 655 F.3d at 999.  Under the Federal Rules of Evidence, a court may take

8   judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally

9   known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready

10  determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R.

11  Evid. 201(b).

12        Here, excerpts from the Rehousing Report are included in the SAC and are central to

13  Plaintiff's claims.  Additionally, Plaintiff does not question the authenticity of the report.

14  Therefore, the Court takes judicial notice of the Rehousing Report.  With regards to the State

15  Court Minutes, Plaintiff does not oppose the request for judicial notice.  Furthermore, the Court

16  finds that the documents are true and correct copies of documents filed in state court and takes

17  judicial notice of the State Court Minutes.  *See* Fed. R. Evid. 201(b)(2); *see also United States v.*

18  *Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records

19  in other cases, as well as the records of an inferior court in other cases.").

20  **IV.    DISCUSSSION**

21        As noted above, Defendants move to dismiss all eight claims in the SAC.  Below, the

22  Court first considers the sufficiency of Plaintiff's allegations as to her § 1983 claims (Counts 1-4)

23  and then does the same for Plaintiff's state law claims (Counts 5-8).

24      **A.    Claims Under 42 U.S.C. § 1983**

25        Counts 1-4 are brought under 42 U.S.C. § 1983, which provides a private right of action

26  against constitutional violations made under color of state law.  To state a claim under 42 U.S.C. §

27
Case No.: 5:19-cv-07888-EJD

28  ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
    COMPLAINT

United States District Court
Northern District of California

1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Defendants assert that the State Court Minutes establish that as of December 2018, Aguilar was serving a sentence imposed on July 25, 2018, after his nolo contendere plea made in court on February 28, 2018. In the Ninth Circuit, a pretrial detainee is transformed into a convicted prisoner for constitutional purposes upon conviction after trial or by plea, at which point the state acquires the right to punish and the Eighth Amendment, rather than the Fourteenth Amendment, is implicated. *Resnick v. Hayes*, 213 F.3d 443, 447-448 (9th Cir. 2000). Accordingly, because Aguilar was a prisoner at the time of his suicide, the Court considers Plaintiff's § 1983 claims under the Eighth Amendment.

As in the FAC, there appears to be some overlap across the four counts; neither the SAC nor Plaintiff's Opposition brief makes clear precisely how the counts differ or relate to one another. Nonetheless, the Court discerns two distinct claims for relief across Counts 1-4 alleged in the SAC. *See* Ord. at 4-6. First, Plaintiff now appears to assert that Defendants infringed Aguilar's constitutional rights as demonstrated by the lack of safety measures taken to address Aguilar's serious medical needs. That claim is based on Defendants' alleged deliberate indifference to Aguilar's suicidal ideations following his decision to disassociate from his gang and request to be placed in protective custody. Second, Plaintiff claims that Defendants' failure to prevent Aguilar's suicide interfered with Plaintiff's right to familial association, which is a substantive due process right under the Fourteenth Amendment. Defendants' arguments with respect to those claims are addressed in turn below. The Court also separately addresses Plaintiff's inclusion of the County and Sheriff Laurie Smith as defendants, which Plaintiff has failed to justify after the Court's Order afforded Plaintiff the opportunity to cure claim deficiencies.

i. **Eighth Amendment—Deliberate Indifference to a Serious Medical Need**

Case No.: 5:19-cv-07888-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

7

United States District Court
Northern District of California

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Under the Eight Amendment, however, deliberate indifference "includes 'both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (alteration in original). "To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need. Such a need exists if failure to treat the injury or condition 'could result in further significant injury' or cause 'the unnecessary and wanton infliction of pain.'" *Id.* (citation omitted). The Ninth Circuit has specifically recognized that "[a] heightened suicide risk or an attempted suicide is a serious medical need." *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010) (citations omitted). Thus, the Court turns its attention to the subjective standard component of the deliberate indifference analysis.

The "subjective inquiry involves two parts." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013). First, plaintiffs "must demonstrate that the risk was obvious or provide other circumstantial or direct evidence that the prison officials were aware of the substantial risk" to Aguilar's safety. *Id.* (citation omitted). "Second, they must show that there was no reasonable justification for exposing the inmate[] to the risk." *Id.*

The SAC presents the following facts in support of Plaintiff's claim that Defendants were deliberately indifferent to Aguilar's serious medical needs: (1) Aguilar requested protective custody status to disassociate from his gang; (2) Aguilar was rehoused to the MC3 unit in the jail where other gang dropouts were also housed; (3) during his stay in MC3, Aguilar twice threatened to fight with other gang dropout inmates; (4) prison officials investigated these events noting that Aguilar appeared to be acting paranoid; (5) other inmates housed with him in MC3 reported that Aguilar acted "a little paranoid" and "a little resistant"; (6) prison officials re-assured Aguilar that the other inmates in MC3 did not present a threat to him; (7) when interviewed, Aguilar reported

United States District Court
Northern District of California

1    that he "didn't have any problems"; and (8) to avoid further conflict with other inmates in MC3,

2    prison officials rehoused Aguilar a second time to a new unit, MC4 – where on the day he

3    committed suicide Aguilar sat "anxiously" on his bunk and did not participate in free time.  *See*

4    SAC ¶¶ 25-27, 32; *see also* Rehousing Report.

5           Assuming, as the Court must, that Aguilar did in fact have suicidal ideations, only those

6    facts describing Aguilar acting paranoid speak to what Defendants knew, or should have known,

7    about Aguilar's mental health and suicidal ideations at the time of his death.  However, these

8    allegations are insufficient to show that the risk was obvious or that prison officials were aware of

9    the substantial risk when Aguilar told officers he "didn't have any problems" after jail officials

10   approached him about his behavior with other inmates in the protective unit.  SAC ¶ 26; *see also*

11   Rehousing Report at 2.  Moreover, courts have generally only validated allegations claiming a

12   heightened risk of suicidal behavior in instances where the inmate had a history of suicidal

13   ideations or when the words or actions of the inmate were suicidal in nature.  *See Smithee v.*

14   *California Corr. Inst.*, No. 1:19-cv-00004-NONE-JLT, 2020 WL 4813205, at *3 (E.D. Cal. Aug.

15   19, 2020) (finding plaintiff was deliberately indifferent after failing to make recommendations on

16   how to treat the deceased's suicidal ideations after having made a psychological assessment);

17   *NeSmith v. Olsen*, 808 F. App'x 442, 445 (9th Cir. 2020) (plaintiffs alleged that defendants found

18   a rope hanging from a light in the cell of an inmate the night before his suicide); *Jones v.*

19   *Kuppinger*, No. 2:13-CV-0451 AC P, 2013 WL 3199320, at *4 (E.D. Cal June 21, 2013) (plaintiff

20   alleged that defendant knew inmate had ripped up his bedsheet, covered up his cell window, and

21   told someone he was feeling suicidal).

22          There is no mention in the SAC of any prior suicide attempts by Aguilar or any allegations

23   about a history of mental health issues or treatment.  Furthermore, Plaintiff does not allege that

24   Aguilar requested mental health care from jail officials, complained of suicidal feelings, or took

25   actions indicative of suicidal behavior.  Plaintiff instead argues that Aguilar was an objective

26   suicide risk because Defendants were "forewarned of mental health issues and a possible suicide

1   attempt, when officials and inmates noted Aguilar appeared paranoid after his arrival to protective

2   custody and concerned that other inmates wanted to "get him" for disassociating from his gang.

3   *See* Opp. at 3; *see also* Rehousing Report at 1.  Additionally, Plaintiff alleges that Aguilar was an

4   objective suicide risk because Deputies Tambini and Tse were monitoring him after his rehousing

5   to another protective unit.  Opp. at 3.  However, Plaintiff does not cite to any authority suggesting

6   that these allegations, without more, are sufficient to allege that Defendants were aware of the

7   substantial risk to Aguilar's safety.  Further, Plaintiff's argument that Deputy Lamar's Rehousing

8   Report recommending that Aguilar be rehoused for his "safety" and the "security of the facility"

9   demonstrates subjective understanding of Aguilar's suicidal ideation, is unavailing.  *See id.*

10   Deputy Lamar's Rehousing Report suggests that he recommended rehousing to protect and

11   prevent physical altercations between Aguilar and the other inmates after Aguilar had already been

12   involved in prior altercations during his limited stay in that protective unit.  *See* Rehousing Report

13   at 1-2.  This, taken together, is insufficient to allege Defendants acted with deliberate indifference

14   to Aguilar's medical needs.

15         Thus, even under the liberal pleading standard set forth by *Twombly* and *Iqbal*, the

16   allegations in the SAC are insufficient to state a claim that Aguilar's Eighth Amendment rights

17   were violated.  Accordingly, the Court GRANTS Defendants' Motion to Dismiss the claim.

18         **ii.**    **Violation of Plaintiff's Right to Familial Relationship**

19         Next, the Court turns to Plaintiff's claim for violation of the right to familial relationship.

20   Parents and children have a "fundamental liberty interest" in "the companionship and society of

21   their child or parent" as a component of their substantive due process rights under the Fourteenth

22   Amendment.  *Lemire*, 726 F.3d at 1075; *see also Lee*, 250 F.3d at 685.  This right to familial

23   association is further supported by the First Amendment's guarantee of freedom of association.

24   *See Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018); *Lee*, 250 F.3d at 685.  Of relevance

25   here, the Ninth Circuit has recognized that official conduct that deprives a parent or child of the

26   companionship and society of a decedent may constitute a constitutional violation.  *Lemire*, 726

27   Case No.: 5:19-cv-07888-EJD

28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
COMPLAINT

F.3d at 1075. The official conduct must "shock the conscience," which is a more demanding standard than deliberate indifference. *Id.* Specifically, the Ninth Circuit has said that deliberately indifferent conduct will generally "shock the conscience" if the defendant "had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Id.*

In this case, Plaintiff's SAC still fails to clear the lower bar of adequately alleging deliberate indifference; *a fortiori*, the SAC does not allege any official conduct that "shocks the conscience." Accordingly, the Court must also DISMISS Plaintiff's claim for violations of the right to familial relationship.

### iii.   Liability of the County

The SAC also raises a claim against the County for violation of Plaintiff's right to familial relationship. The Court previously dismissed Plaintiff's § 1983 claims asserted against the County, including the claim for violation of Plaintiff's right to familial relationship, but allowed leave to amend. Ord., at 9-11. The Court's ruling was based upon Plaintiff's inclusion of the County as a defendant without identifying a specific county policy or custom—or lack of policy or custom—that allegedly caused Aguilar's death. Plaintiff's SAC still fails to identify any specific county policy or custom—or lack of policy or custom—that allegedly caused Aguilar's death. Thus, Plaintiff has failed to state a claim against the County.[3]

Accordingly, the Court must DISMISS Plaintiff's § 1983 claim against the County for violation of Plaintiff's right to familial relationship as the SAC does not contain any allegations connecting the County to asserted constitutional violations.

### iv.   Qualified Immunity

Defendants also contend that Plaintiff's § 1983 claims should be dismissed against the individual defendants as barred by qualified immunity. Mot. at 11-13.

---

[3] The Court also previously dismissed Plaintiff's § 1983 claims brought against Sherriff Smith with leave to amend. Although the SAC names Sheriff Smith as a defendant, Plaintiff does not bring any § 1983 claims against Sheriff Smith. Therefore, there is no need to address Defendants' arguments as to Sherriff Smith and Plaintiff's § 1983 claims.

United States District Court
Northern District of California

1   The doctrine of qualified immunity "protects government officials 'from liability for civil

2   damages insofar as their conduct does not violate clearly established statutory or constitutional

3   rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223,

4   231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity

5   analysis "must be undertaken in light of the specific context of the case, not as a broad general

6   proposition." *Mendez v. Cty. of Los Angeles*, 815 F.3d 1178, 1186 (9th Cir. 2016) (quoting

7   *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), *overruled on other grounds by Cty. of Los Angeles,*

8   *Calif. v. Mendez*, 137 S. Ct. 1539 (2017).  "To determine whether an officer is entitled to qualified

9   immunity, [the Court] ask[s], in the order [it] choose[s], (1) whether the alleged misconduct

10  violated a [constitutional] right and (2) whether the right was clearly established at the time of the

11  alleged misconduct." *Hernandez v. City of San Jose*, 897 F. 3d 1125, 1132 (9th Cir. July 27,

12  2018) (quoting *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) ) (alterations in

13  *Hernandez*, 897 F.3d 1125); see also *Pearson*, 555 U.S. at 232 (same).  Qualified immunity

14  applies unless the answer to both questions is "yes."  *See Pearson*, 555 U.S. at 232.

15  Defendants prevail on the second prong of the qualified immunity analysis, because even if

16  Plaintiff had alleged facts showing a violation of a constitutional right, there is no clearly

17  established law controlling the specific facts of this case.  "An officer 'cannot be said to have

18  violated a clearly established right unless the right's contours were sufficiently definite that any

19  reasonable official in [his] shoes would have understood that he was violating it,' meaning that

20  'existing precedent . . . placed the statutory or constitutional question beyond debate.'" *City and*

21  *Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in

22  original; citation omitted); *see, e.g., Carroll v. Carman*, 574 U.S. 13, 16–18 (2014) (law not

23  clearly established whether officer may conduct a "knock and talk" at any entrance to a home that

24  is open to visitors, rather than only at the front door); *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th

25  Cir. 2019) (defendants entitled to qualified immunity where "the specific right that the inmates

26  claim in these cases—the right to be free from heightened exposure to Valley Fever spores—was

27

28  Case No.: 5:19-cv-07888-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
COMPLAINT

1    not clearly established at the time"); *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 601–

2    02 (9th Cir. 2019) (officer entitled to qualified immunity on failure-to-protect claim from pretrial

3    detainee who had attempted to hang himself because there was conflicting information as to

4    whether he was suicidal and the case law "was simply too sparse, and involved circumstances too

5    distinct from those in this case, to establish that a reasonable officer would perceive a substantial

6    risk that [detainee] would imminently attempt suicide").

7            Plaintiff argues that qualified immunity does not apply in this case because "custodial

8    safety" is a "clearly established right," and Defendants did not act "reasonably" in response to the

9    "warnings in [Deputy] Lamar's report."  Opp. at 4-5.  However, the Supreme Court "has

10   repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law

11   at a high level of generality."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)

12   (officer entitled to qualified immunity for shooting a woman who was armed with a large knife,

13   was ignoring officers' orders to drop the weapon, and was within striking distance of her

14   housemate; prior cases on excessive force did not clearly establish that it was unlawful to use force

15   under these circumstances, where officer may not have been in apparent danger but believed  the

16   woman was a threat to her housemate).

17           Here, the sparse case law on correctional officers' obligation to prevent the suicides of

18   inmates who have suicidal ideations does not, taken as a whole, indicate that Defendants violated a

19   right of Aguilar's that was so well established that all reasonable officers would understand that

20   right was violated by their conduct.  Indeed, the Ninth Circuit's holding in *Horton v. City of Santa*

21   *Maria* is instructive.  In *Horton*, an eighteen-year-old had been arrested, taken to the local police

22   department, and detained in a temporary holding cell.  *Horton by Horton*, 915 F.3d at 596.  Even

23   though the officer knew he was a suicide risk, he left the detainee unattended for approximately a

24   half-hour while he spoke with the detainee's mother and completed paperwork.  *Id*. at 596.  In that

25   time, the detainee "removed his belt, fed it through the cell door bars, and hanged himself, causing

26   permanent and severe damage."  *Id*.  The Ninth Circuit determined that based on the facts as well

27

28

United States District Court
Northern District of California

as the law at the time of the incident, "a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful." *Id*. at 601.  The Ninth Circuit distinguished the facts at issue in *Horton* from those in *Conn v. City of Reno* and *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010), where there was an imminent suicide risk that was ignored by defendant officers who were aware of the risk.  *Id*. at 601-602.  When the event in *Horton* took place, there was no case law clearly establishing that, absent some moment of punctuated crisis, officers have an obligation to implement particular suicide-prevention protocols.

Thus, in light of the absence of any controlling authority cited by Plaintiff, the Court finds that Defendants are entitled qualified immunity.  The case law at the time of Aguilar's suicide did not clearly establish that a reasonable officer in Defendants' position was required to refer an inmate, who had recently been put in protective custody, for suicide protocol in the absence of a history of mental illness or treatment, prior suicide attempts, prior requests of mental health care, or prior behavior indicating a heightened risk of suicide.  Accordingly, Defendants' Motion to Dismiss on qualified immunity grounds is GRANTED.

**B.    State Law Claims**

Defendants also move to dismiss Counts 5-8, which are California state law claims based on the same facts as the § 1983 claims.  The Court first addresses the negligence claims together (Counts 5 and 7) before turning to the claim for failure to summon medical care (Count 6).[4]

**i.    General Negligence Claims**

Just as in the FAC, Counts 5 and 7 allege that Defendants negligently failed to address Aguilar's suicidal ideation.  The difference between the claims is that Count 7 is brought as a wrongful death action under California Code of Civil Procedure § 377.60, whereas Count 5 is a generic negligence action; both assert the same factual claim for relief that the Court has already

---

[4] Plaintiff has also brought a common law claim for intentional infliction of emotional distress (Count 8) against Defendants.  However, the Court's prior Order granted Defendants' motion to dismiss the claim for intentional infliction of emotional distress without leave to amend.  Ord. at 14-16.  Therefore, the Court does not consider Plaintiff's new intentional infliction of emotional distress claim.

Case No.: 5:19-cv-07888-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    found deficient in its analysis of the FAC.  *See* Ord at 12-13.  The only new argument that Plaintiff

2    raises is that "[Deputy] Lamar's report demonstrates that jail officials breached a reasonable duty

3    to rehouse Aguilar."  Opp. at 6.  However, this assertion contradicts Plaintiff's own allegations

4    that Defendants rehoused Aguilar to a higher level of protective custody in response to Deputy

5    Lamar's recommendation, which according to the Rehousing Report, was made to protect Aguilar

6    from physical altercations between himself and other inmates and not Aguilar's mental health.

7    *See* SAC ¶¶ 26-27; *see also* Rehousing Report at 2.  Furthermore, under California Government

8    Code § 855.8(a), all of the defendants named in the SAC also did not have a duty to recognize that

9    Aguilar was suicidal.  *See* Ord. at 12-13; *see also Johnson v. Cty. of Los Angeles*, 143 Cal. App.

10   3d 298, 316 (Ct. App. 1983) (quoting Cal. Gov. Code § 855.8(a)).  The Court, therefore, finds that

11   Plaintiff has failed to cure the deficiencies in the negligence claims which were based on  the

12   individual Defendants' failure to address Aguilar's suicidality.

13          Plaintiff also asserts her wrongful death claim against the County.  However, California

14   Government Code § 844.6 makes public entities immune from liability for an injury to "any

15   prisoner."  Cal. Gov't Code § 844.6; *see also Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal.

16   App. 4th 1051, 1069 (2013); *Resendiz v. Cty. of Monterey*, No. 14-CV-05495-LHK, 2015 WL

17   3988495, at *6 (N.D. Cal. June 30, 2015).  Moreover, such immunity extends to wrongful death

18   actions as well as a survival action.  *Lowman v. Cty. of Los Angeles*, 127 Cal. App. 3d 613, 615

19   (Ct. App. 1982).  There are statutory exceptions to § 844.6, one of which is failure to summon

20   medical care under California Government Code § 845.6; that exception is the basis for Count 6.

21   Plaintiff does not, however, point to any other applicable exception.  *See* Opp. 7.

22          Thus, Counts 5 and 7 are DISMISSED.

23      **ii.    Failure to Summon Medical Care under California Government Code § 845.6**

24          Count 6 alleges that Defendants violated California Government Code § 845.6 by their

25   failure to summon medical care.  Section 845.6 provides, in pertinent part:

26          Neither a public entity nor a public employee is liable for injury
             proximately caused by the failure of the employee to furnish or obtain
27

Case No.: 5:19-cv-07888-EJD
28   ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
     COMPLAINT

1
2
3

> medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

4

To state a claim under § 845.6, a plaintiff must establish three elements: "(1) the public

5

employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed

6

to reasonably summon such care." *Jett v. Penner*, 439 F.3d 1091, 1099 (9th Cir. 2006) (citing

7

*Watson v. State of California*, 21 Cal. App. 4th 836, 841 (1993)).  In addition, California courts

8

have limited liability under § 845.6 to "serious and obvious medical conditions requiring

9

immediate care."  *Watson*, 21 Cal. App. 4th at 841; *accord George v. Sonoma Cty. Sheriff's Dep't*,

10

No. C-08-02675 EDL, 2010 WL 4117381, at *7 (N.D. Cal. Oct. 19, 2010).

11

Here, Defendants do not dispute that "[a] suicidal state is a serious and obvious medical

12

condition requiring immediate care."  Mot. at 16; *see also  Johnson v. Baca*, No.

13

CV1304496MMMAJWX, 2014 WL 12558252, at *22 (C.D. Cal. Oct. 9, 2014).  Nonetheless, the

14

Court has already found that Plaintiff has not alleged any facts demonstrating that any County

15

employee, including the newly added individual defendants, "knew or had reason to know" of

16

Aguilar's risk of suicide during his detention.  Accordingly, Defendants' Motion to Dismiss Count

17

6 is GRANTED.

18

### C.    Leave to Amend

19

Federal Rule of Civil Procedure 15(a) establishes that leave to amend "shall be freely given

20

when justice so requires."  Fed. R. Civ. P. 15(a).  In general, valid reasons for denying leave to

21

amend include undue delay, bad faith, prejudice, and futility.  *Foman v. Davis*, 371 U.S. 178, 182

22

(1962).  The court may also consider whether pleadings have previously been amended.  *Bonin v.*

23

*Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

24

In this case, Plaintiff has already been afforded the opportunity to amend her complaint.

25

Moreover, Plaintiff lodged a proposed third amended complaint, which presumably attempts to

26

address the deficiencies identified by Defendants' Motion to Dismiss.  The third amended

27
28

1   complaint drops the County and Sherriff Smith, thereby conceding the futility of further

2   amendment.  With respect to particular claims, the third amended complaint either fails to make

3   further allegations or adds allegations that are insufficient to support the claim.  As such, the Court

4   finds that further leave to amend would be futile.  Plaintiff's request for leave to amend is

5   DENIED.

6   **V.     CONCLUSION**

7         For the foregoing reasons, the court GRANTS Defendants' Motion and DISMISSES

8   Plaintiff's Second Amended Complaint with prejudice.

9         **IT IS SO ORDERED.**

10  Dated: December 8, 2020

11

12  EDWARD J. DAVILA
    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 5:19-cv-07888-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED
COMPLAINT